Georgia P. Johnson v. Commissioner. Estate of Clara H. Robertson, Deceased, First National Bank, Executor, and Estate of Frank B. Robertson, Deceased, Louise R. Wilbourn, Administratrix v. Commissioner. John A. Hourigan v. Commissioner. Caroline Hourigan v. Commissioner. John A. Hourigan, Jr. v. Commissioner. Carolyn Hourigan v. Commissioner.
Johnson v. Commissioner
Docket Nos. 7589, 7590, 7788, 7789, 7790 and 7791.
United States Tax Court
1947 Tax Ct. Memo LEXIS 189; 6 T.C.M. (CCH) 633; T.C.M. (RIA) 47152; June 5, 1947. James S. Y. Ivins, Esq., 306 Southern Bldg., Washington 5, D.C., and Thomas S. Hinkel, Esq., for the petitioners in Docket Nos. 7589 and 7590. Leon Meltzer, Esq., 1526-28 Land Title Bldg., Philadelphia 10, *190 Pa., for the petitioners in Docket Nos. 7788, 7789, 7790, and 7791. Karl W. Windhorst, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By these consolidated proceedings, petitioners challenge respondent's determinations of deficiencies in income tax for the calendar year 1941, in the following amounts: Petitioner
Docket No.
Amount
Georgia P. Johnson
7589
$14,038.33
Estate of Clara H. Robertson
7590
15,599.24
Estate of Frank B. Robertson
John A. Hourigan
7788
9,652.79
Caroline Hourigan
7789
999.30
John A. Hourigan, Jr.
7790
722.60
Carolyn Hourigan
7791
1,444.52
Petitioner in Docket No. 7589 claims an overpayment in 1941 income tax in the sum of $3,482.14. The principal question common to all of the dockets is the nature of cash distributions received by petitioners in 1941 from Wilkes-Barre Publishing Company. Respondent's principal contention is that such distributions are taxable as dividends under Internal Revenue Code, section 115; petitioners assert that the distributions fall within the purview of Internal Revenue Code, section 115(c) *191 . In Docket Nos. 7788 and 7789, an additional question is the amount, if any, of long-term capital gains realized by petitioners on the sales in 1941 of first preferred stock of Wilkes-Barre Publishing Company. Some of the facts have been stipulated in two stipulations of fact, a supplemental stipulation of facts, and exhibits thereto attached, and also orally at the hearing. Others have been presented by oral and documentary evidence. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner Georgia P. Johnson is an individual residing at Wilkes-Barre, Pennsylvania. Her income tax return for the calendar year 1941 was filed with the collector for the twelfth district of Pennsylvania. Clara H. Robertson and her husband, Frank B. Robertson, were individuals, residing in Tennessee. They filed a joint income tax return for the calendar year 1941 with the collector at Nashville, Tennessee. Clara Robertson died testate on June 13, 1942, and letters testamentary were issued to the First National Bank at Memphis, on July 7, 1942, by the Probate Court for Shelby County, Tennessee. Frank Robertson died intestate on April 26, 1942, and letters of administration *192 were issued to Louise R. Wilbourn, on July 7, 1942, by the Probate Court for Shelby County, Tennessee. The letters testamentary and the letters of administration are still in full force and effect. Petitioners John A. Hourigan, Caroline Hourigan, John A. Hourigan, Jr., and Carolyn Hourigan are husband, wife, son, and daughter, respectively, residing in Wilkes-Barre, Pennsylvania. Each filed his income tax return for the year 1941 with the collector for the twelfth district of Pennsylvania. For many years prior to 1939 three newspapers were being published in Wilkes-Barre - The Record, a morning newspaper; The Times-Leader and The Evening News, evening newspapers. Prior to 1900 The Record was published by a partnership, consisting of Frederick C. Johnson and Joseph C. Powell. The business was incorporated in 1900 as a Pennsylvania corporation under the name of Wilkes-Barre Record Company. Georgia Johnson became the owner of 10 shares of the capital stock at about that time. At the death of her husband on March 5, 1913, she inherited from him a life estate in an additional 490 shares. For purposes of valuation, it is stipulated that the date may be assumed to have been March 1, 1913. *193 In or about 1900, Clara Robertson became the owner of 10 shares of Record's stock. In July, 1904, upon the death of her first husband, Joseph Powell, she inherited an additional 490 shares. On March 3, 1903, the Leader Company was incorporated as a Pennsylvania corporation under the name of Leader Publishing Company. In 1909 it acquired another newspaper being published in the city, The Times, and thereafter, these two papers being combined, the Leader Company published under the name of Times-Leader. Leader's principal stockholder was Ernest G. Smith. In June, 1909, John Hourigan, together with T. F. Heffernan, purchased The Evening News, at a cost of $40,000 in cash, plus personal assumption of $10,000 indebtedness, which was subsequently paid by Hourigan. The vendors were Ambrose West and George Stigmier, who were also engaged in other business activities. On February 28, 1913, Hourigan purchased Heffernan's interest. On December 31, 1935, he made a gift of a 24 percent interest in the business to each of his children, John, Jr., and Carolyn. The business was thereafter continued as a partnership until incorporation proceedings were completed in March, 1939, when The Evening *194 News, Inc., was organized to take over the assets of the partnership and the real estate which housed the plant then owned by Hourigan and his wife as tenants by the entirety with a cost basis to them of $43,610.95. The corporation's stated capital was $5,000 divided into 50 shares of a par value of $100 per share. The stock was distributed, in what the parties assume to have been a tax-free exchange, as follows: Petitioners
Shares of Stock
John Hourigan
17 - 17/20
John Hourigan, Jr.
9 - 7/20 Carolyn Hourigan
11 - 6/20 John Hourigan and
Caroline Hourigan
11 - 10/20
In about 1932 intense competition developed among the newspapers, particularly between The Record and The Leader, which impaired the earnings of each. Suggestions for merger made from time to time between 1932 and 1938 produced no results. In October, 1938, the three newspaper plants were closed as a result of a strike, which was not settled until the spring of 1939. Fearful of the possible effects of the strike and of the continued keen competition, the Society for Savings, a Cleveland, Ohio, banking firm specializing in newspaper loans, which held a mortgage against Leader for loans *195 aggregating over $390,000, brought pressure on the Leader management, which had previously resisted merger overtures, to enter into negotiations for merger. In early 1939, it was decided that it would be advantageous to all concerned to merge the three newspapers, form a new corporation, known as the Wilkes-Barre Publishing Company, and publish but one morning and one evening paper. The effective date of the merger was to be March 1, 1939. The problem was complicated by Leader's mortgage debt of $390,000, which could be reduced to about $263,000 by application of the surrender values of insurance on Smith's life, while the assets of the other two papers were free and clear. When it was learned that the bank would not carry the loan for him individually, Smith demanded that the new corporation assume it. Since he did not desire that his share in both the control and profits of the new corporation be diminished by its assumption of his indebtedness, he insisted that the new corporation issue to those owning the other interests, notes or a prior preferred stock which could be retired, so that his interest would eventually be increased and those of the Record and News decreased by *196 the retirement of such notes or preferred shares. This view, together with other conditions of the merger, was embodied in the preliminary agreement of merger, dated March 7, 1939: "WHEREAS, it is the desire of all the parties hereto to merge the Leader, the Record and the News, so that the resulting corporation will have the assets of the said three corporations and the newspapers heretofore published by them; and "WHEREAS a certain formula has been used based on the books of the three businesses as of February 1939, to ascertain the value of the intangibles of each newspaper, and such value has been ascertained and established satisfactorily to each of the parties hereto; and "WHEREAS there are certain other debts and assets which are to be compensated for and adjusted by the assumption by the corporation and by an issue of preferred stock and/or notes of the corporation to the contributing parties; * * *
"The new corporation shall issue either prior preferred stock having a five per cent (5%) dividend return, or Notes bearing interest at five per cent (5%), to offset the indebtedness of the Leader. Such issue shall be callable on any dividend or interest paying date *197 in whole or in part at par and accrued interest or dividends. There shall be a sinking fund established of such percentage of the annual net profits of the corporation after payment of the year's reduction of principal of the Leader's indebtedness as the Directors may from year to year determine is in accordance with sound business practice, and said sinking fund shall be annually applied, together with moneys from any other source deemed proper by the Directors, to the redemption of the outstanding issue. The true intent and purpose of this paragraph is that the issue of preferred stock or notes, being a compensation for the Leader indebtedness, that the new company should pay off both as nearly equally as is possible consistent with good business practice and that after the Leader indebtedness is paid in full that the balance of the issue provided for in this paragraph shall be paid as rapidly as can reasonably be done. "The new corporation shall issue preferred stock or notes second to that provided in 2 above, to the owners of the three merged companies in payment for their physical assets, the value of said assets to be determined by the representatives of the three merged companies, *198 and in case of failure of such representatives to agree, then the value to be determined by the American Appraisal Company or such other appraiser as may be agreed upon. Said values shall be determined on the basis of the fair market value of a going concern regardless of whether all or any part of said assets are, or are not, to be utilized in the new company. For any property not heretofore used in the operation of the newspapers, the valuation shall be fixed by the fair market value thereof. This security shall be callable in whole or in part at par and accrued interest or dividends at any interest or dividend date and it is the intent of the parties hereto that this security be taken up by the company as rapidly as the situation permits consistent with good business practice. "The new corporation shall issue common stock to the owners of the merging companies, forty-two per cent (42%) of the entire issue to the owners of the common stock of the Leader, Thirty-nine per cent (39%) to the owners of the common stock of the Record, and Nineteen per cent (19%) to the owners of the common stock of the News, the corporation. "All the common capital stock shall be deposited in a Voting *199 Trust for ten (10) years or longer if permitted by law. The Voting Trustees shall be an equal number representing each paper and the Voting Trust Agreement shall provide that a unanimous vote of all is necessary to action by the Trustees." Subsequently, on November 6, 1939, a formal agreement of merger was duly executed, which provided in part as follows: "The corporation surviving the merger shall be the Wilkes-Barre Publishing Company (the Surviving Corporation) which is a corporation organized under the laws of the State of Pennsylvania. * * *
"The total number of shares which the Surviving Corporation shall have the authority to issue shall be 13,897 shares, of which 3,120 shares shall be 5% First Preferred, Non-Voting stock of the par value of $100.00 each, 9,777 shares shall be 5% Second Preferred, Non-voting stock of the par value of $100.00 each, and 1,000 shares shall be Common stock of the par value of $100.00 each. "The manner of converting the capital stock of the parties of the first, second and third parts into the capital stock of the Surviving Corporation, and the manner and basis of exchanging the outstanding certificates for shares of outstanding stock *200 of the said constituent corporations, shall be as follows: "(a) The First Preferred stock shall be issued 2,080 shares to the owners of the stock of the Record, 1,040 shares to the owners of the stock of the News; "(b) The Second Preferred stock shall be issued 3,355 shares to the owners of the stock of the Leader in payment of its physical assets; 4,594 shares to the owners of the stock of the Record in payment for its physical assets; and 1,813 shares to the owners of the stock of the News in payment for its physical assets. "(c) The Common stock shall be issued 420 shares to the owners of the stock of the Leader, 390 shares to the owners of the stock of the Record, and 190 shares to the owners of the stock of the News, in exchange for the intangible assets of each of said corporations." Prior to the execution of the formal agreement, the merging companies employed tax counsel to assist and advise with reference to the tax consequences of the merger. In August, 1939, counsel applied to respondent for closing agreements, stating that the merger would come within the provisions of 112(g)(1) and 112(b)(3) of the Internal Revenue Code. With this position *201 respondent agreed, and advised the parties on October 4, 1939, that he would recommend the approval of a closing agreement which was subsequently signed. Respondent further stated: "* * * no taxable gain or deductible loss will result to the merging companies, the Leader Publishing Company, the the Wilkes-Barre Record Company, the Evening News, Inc., the Wilkes-Barre Publishing Company, or any of the stockholders, and that the bases of the assets acquired by the surviving corporation as a result of the transaction will be the same as in the hands of the transferors, with any proper adjustments as provided by law." The new corporation's common stock was issued in proportion to intangibles or going concern values attributable to each of the merging companies, which were appraised by the appraisers of the Society of Savings. The determined proportions were 42 per cent for Leader, 39 per cent for Record, 19 per cent for News. The second preferred stock of a par value of $100 per share was issued for the physical assets of the merging companies, based upon appraised values, as follows: Appraised Value
Par Value
of Plant,
Second
Equipment
Preferred
Record
$459,450.82
$459,400.00
News
181,466.19
181,300.00
Leader
335,514.32
335,500.00
$976,431.33
$976,200.00
*202 The first preferred was issued to offset the indebtedness of Leader, which the new corporation assumed, and which after a payment thereon by Smith amounted to $250,000. As of March 1, 1939, the effective date of the merger, the new corporation's first preferred stock was of a value of $100 per share; its second preferred stock, $85 per share; its common stock, $25 per share. In exchange for their stock in the merging companies, the stockholders in 1940 received certificates representing shares of stock of the new corporation as follows: First
Second
Stockholder
Preferred
Preferred
Common
RECORD
Georgia Johnson, individually and as trustee
1049
2297
195
Clara Robertson
1049
2297
195
LEADER
Ernest Smith
None
2805
420
Marjorie Smith
None
450 None
Harrison Smith
None
50  None
Lois Smith
None
50  None
NEWS
John Hourign
364.8540 647.241 67.83 John Hourigan, Jr.
191.114 339.031 35.53 Carolyn Hourigan
230.9720 409.738 42.94 John Hourigan and Caroline Hourigan, with
right of survivorship
235.06 416.99 43.70 After some consideration, it was finally determined that the first preferred *203 stock was to be issued in the same proportions as the common stock. In October, 1940, after Smith had made some payments on The Leader indebtedness, the amount thereof assumed by the new corporation was ascertainable, and found to be $250,000. Upon application of the ratios of 42, 39, and 19, it was discovered that the Record and News interests were entitled to additional stock or the value thereof in the amount of $33,238.09. In order to meet this deficit and at the same time satisfy the objections of Smith to the issuance of additional first preferred stock, a plan was conceived of issuing notes and paying them immediately. On January 30, 1941, the directors of the new corporation adopted a resolution reading: "The Board authorized the payment of notes held by the Evening Newsinc. interests and Record interests representing the difference between the first preferred issued and outstanding and the first preferred which should have been issued to offset the Cleveland bank indebtedness of the Leader Publishing Company, as provided in the merger agreement, with accrued interest of 5% for the first 12 months and 4 1/2% thereafter until the date of liquidation." And pursuant *204 to the terms of the resolution, the following cash distributions were made: Petitioner
Amount
Georgia Johnson
$11,171.43
Clara Robertson
11,171.43
John Hourigan
3,889.60
John Hourigan, Jr.
2,037.41
Carolyn Hourigan
2,462.32
John Hourigan and
Caroline Hourigan
2,505.90
Total
$33,238.09
No notes were then outstanding, although notes had been drawn up the same day as the resolution was passed. Upon advice of tax counsel that the resolution might be contrary to the terms of the closing agreement, a resolution was adopted on July 16, 1941, as follows: "It was moved, seconded and passed 'that the Secretary-Treasurer and President of the Wilkes-Barre Publishing Co., be and is hereby directed to increase the capital stock of the Wilkes-Barre Publishing Co., first preferred, by the sum of $33,238.09, and pay the Pennsylvania Corporation bonus tax to the Commonwealth and buy Federal Stock Tax Stamps, to cover this additional stock'." Thereafter an information return was filed with respondent on Form 966 with respect to the action of January 30, 1941, to which was attached the following affidavit of Charles B. Waller, Secretary and Treasurer of the new *205 corporation: "CHARLES B. WALLER, being duly sworn according to law, deposes and says that he is Secretary of the Wilkes-Barre Publishing Company, a Pennsylvania Corporation; that the certified copy of Resolution adopted by the Board of Directors on January 30th, 1941, herewith attached, in fact covers the retirement of stock and not of notes as is stated in the first sentence thereof; that the Merger Agreement to which said Resolution is tied in and which is on file with the Department of Internal Revenue provides for the issuance of stock and not of notes to cover the said indebtedness; that the records of the corporation treat said redemption as stock and not as notes, and that what is misnamed 'interest' in said Resolution was not deducted on the Income Tax Return of said corporation but was treated as 'earnings' and paid out as dividends; and said entire transaction was the redemption of preferred stock and not payment of notes as stated in said Resolution; that when said Resolution was read at a subsequent meeting of the Board, it was directed that the Resolution be corrected to provide for the redemption of said stock and not for the payment of notes that no notes were ever *206 issued for the amount referred to." No additional shares of first preferred stock were issued by the new corporation in connection with the distribution in January, 1941. During the remainder of 1941, the question of whether the first preferred stock should be retired was argued, Smith demanding that there be such retirement, the Record and News interests opposing. At one point Smith threatened legal action to force retirement. It was finally decided to call the first preferred stock from time to time. On December 17, 1941, the new corporation's board of directors resolved that $38,500 of the Record interest and $18,700 (later corrected to $18,600) of the News interest first preferred stock be retired as of December 31, 1941, and pursuant to this resolution the following distributions were made to the holders of the first preferred stock upon surrender by them of a corresponding number of shares: Name of
No. of Shares
Individual
Surrendered
Amount
Georgia Johnson
192.5
$19,250.00
Clara Robertson
192.5
19,250.00
Total
385.0
$38,500.00
John Hourigan
13.5
$ 1,350.00
John Hourigan, Jr.
35.0
3,500.00
Carolyn Hourigan
42  4,200.00
Caroline Hourigan
13.5
1,350.00
John Malinowski
27  2,700.00
Guy Moore
55  5,500.00
Total
186.0
$18,600.00
*207 It is these distributions of January and December, 1941, which respondent has determined as being taxable as dividends. Respondent's position, as asserted at the hearing, was that "112(c) has no application. * * * our position is that it is a section 115 transaction and that first, it is either taxable under 115(g), or possibly 115(a). Then, if not, it is taxable under 115(c)." The amount of earned surplus and undivided profits of Wilkes-Barre Publishing Company at the close of each of the fiscal years beginning March 1, 1939, March 1, 1940, and March 1, 1941, as shown on the balance sheets attached to the corporation's income tax returns filed for each of the fiscal years was, respectively, $22,486.78, $94,954.91, and $77,138.78. Its net income for the same years as shown by its tax returns was, respectively, $77,486.46, $205,218.05, and $139,456.62. Mrs. Johnson and Mrs. Robertson each became entitled, at the time of the merger, to a half interest in certain assets of the Record Company which were not being put into the merger. The value of each such interest was approximately $13,200.21. The assets were transferred to a trustee, for liquidation. From the proceeds he paid *208 Mrs. Johnson $4,000 in 1940 and $7,000 in 1941. She reported no part of the $13,200.21 as income in 1939 but did report $4,000 in 1940 and $7,000 in 1941. In computing the deficiency herein, the respondent eliminated $7,000 from her 1941 income. He transferred it to 1939. Mrs. Johnson filed a claim for refund on March 14, 1945, based upon erroneous inclusion of $7,000 of income in her return for 1941. As a preliminary step to the merger, the partners of the News distributed all assets except plant and equipment to the partners. The net assets so distributed, were in the amount of $20,630.55. Malinowski and Moore purchased shares of the first preferred stock from the Hourigans on December 15, 1941, for $100 per share, as follows: Malinowski - 86 shares, owned jointly by Hourigan and his wife 64 shares owned by Hourigan Moore - 300 shares owned by Hourigan With reference to these sales respondent determined that since no basis had been established, long-term gain in the full amount recognized under section 117 of the Internal Revenue Code had been received by the petitioners involved. The News' net worth at various dates was as follows: July 31, 1909
$42,755.78
December 31, 1909
45,172.13
December 31, 1910
55,198.11
February 29, 1912
67,340.92
December 31, 1912
83,873.59
February 28, 1913
88,626.51
*209 Its total earnings from June, 1909, to February, 1913, inclusive, were $43,026.51. Its circulation increased from 8,234 on October 1, 1909, to 15,090 on February 22, 1913, as a result of an active campaign undertaken by Hourigan. The average yearly earnings of The Record for the four-year period preceding March 1, 1913, were $59,000. Its circulation in 1913 was about 12,000. The Record's balance sheets for the period 1908 to 1912 are as follows: December
31st:
BALANCE SHEETS
1908
1909
1910
1911
1912
ASSETS: Cash in Banks
$ 60,580.27
$ 32,757.99
$41,404.83
$ 49,822.51
$ 57,885.82
Accounts Receivable
40,783.89
52,365.73
63,110.59
75,081.57
71,851.33
Investments
37,000.00
37,000.00
37,000.00
37,000.00
Plant Assets
89,603.84
89,603.84
89,603.84
89,603.84
89,603.84
Total Assets
$190,968.00
$211,727.56
$231,119.26
$251,507.92
$256,340.99
LIABILITIES & CAPITAL: Current Liabilities
$ 531.99
$ $ 607.95
$ 634.63
$ 337.33
Capital Stock
100,000.00
100,000.00
100,000.00
100,000.00
100,000.00
Surplus
90,436.01
111,727.56
130,511.31
150,873.29
156,003.66
Totals
$190,968.00
$211,727.56
$231,119.26
$251,507.92
$256,340.99
*210 Five Years
BALANCE SHEETS
Averages
ASSETS:
Cash in Banks
$ 48,490.28
Accounts Receivable
60,638.62
Investments
29,600.00
Plant Assets
89,603.84
Total Assets
$228,332.74
LIABILITIES & CAPITAL:
Current Liabilities
$ 422.38
Capital Stock
100,000.00
Surplus
127,910.37
Totals $228,332.75
A newspaper publisher and appraiser, called by petitioners in Docket Nos. 7589 to 7590, was of the opinion that as of March 1, 1913, the fair market value of The Record was $650,000, basing his opinion on the belief that a purchaser would be willing to pay ten times the average earnings, plus dollar for dollar for the cash on hand, which was in the amount of $62,318.54. The fair market value of the News as of March 1, 1913, was $235,000, of which the amount unrecovered as of March 1, 1939, was $214,369.45. The fair market value of the Record as of March 1, 1913, was $527,784.79. Opinion Dealing first with the distribution in January, 1941, which took the form of a payment in cash without the actual redemption of any stock, - since none was outstanding to represent the proportionate payments made at that time, - a summary of the chronology of events *211 may clarify the generating circumstances. Early in 1939 the parties began to discuss the question of merger. A preliminary agreement, dated March 7, 1939, for a merger effective as of March 1, 1939, was followed by an application to respondent for a closing agreement in August, 1939, to which he replied in October. On November 6, 1939, the formal agreement of merger was executed, and the stock in the new corporation provided by that agreement was issued sometime in 1940, - the first preferred stock on June 11th. Sometime later payments were apparently made on the indebtedness of one of the merging corporations, so that in October of the same year the amount of the debt remaining to be assumed by the new corporation became ascertainable. Within a few months thereafter - in January, 1941, - the distribution in question was made in order to complete the equalization between the indebtedness assumed on the one hand and the first preferred stock already issued on the other. No express provision for an equalization of that character appears in the formal agreement of reorganization; but it is evident from its general tenor that a payment of some kind was required to conform to the stated *212 purpose of the parties in creating the plan - namely, to equalize the benefits between the corporation whose debt was being assumed and the other merging companies. What the parties intended to do is extremely ambiguous since they refer in a contemporaneous resolution to a payment of notes which it now appears were never delivered and in a subsequent "correction" to a redemption of preferred stock, which not only was never issued but apparently never authorized. But, in any event, if we judge the transaction by what was done rather than by some indefinite and inchoate motive or plan, - see Flanagan v. Helvering (App. D.C.), 116 Fed. (2d) 937; Smith v. United States (C.C.A., 3rd Cir.), 121 Fed. (2d) 692, - the payment in 1941 appears to be an integral part of the reorganization itself. Both the sequence of events and the logic of the situation demonstrate that the ultimate effectuation of the original reorganization plan was not actually and finally brought to completion until the distribution in question had been made. Were it not for the insistence of respondent, this would thus seem to be a clear case for the application of section 112(c)(2), Internal Revenue Code *213 . [1] The distributions which petitioners received must have been envisaged in the plan of reorganization, which alone furnished both the occasion and the authorization for the payments. Had it not been for the merger, the unbalanced debt of the merging interests, and the necessity for finding some method of equalization, the payment would have performed no function. Even the detail of the transaction with its anomalous reference to notes which were never delivered and its subsequent reformation into preferred stock which was never issued was occasioned by the failure of the parties to estimate accurately the precise amount by which the unpaid indebtedness of one of the participating corporations exceeded the amount originally anticipated. *214 Conforming to the authorities which hold that a reorganization plan is to be viewed as a whole, [2] that transactions which are envisaged by the plan and subsequently take place cannot be severed from it and treated as distinct operations, [3] and that given results at the end of the winding path are not to be viewed differently from those reached by a direct road, [4] the conclusion would be that under section 112(c)(2) the distributions should be treated as having been made pursuant to a reorganization, that they were essentially equivalent to taxable dividends to the former owners of two of the participating corporations, and that they should be taxable to the extent of the available earnings and profits, Commissioner v. Munter, 331 U.S. 210 (May 5, 1947), and in proportion to the gain of the respective recipients, Isabella M. Sheldon, 6 T.C. 510. *215 Respondent insists, however, that that section is inapplicable, and that his determination is in no way founded upon it. While we are accordingly compelled to the view that petitioners cannot be charged with the liability which would attach if respondent's position and the present determination were based upon that section, cf. Helvering v. Wood, 309 U.S. 344, we should ordinarily be equally deterred from applying section 115(g), (or 115(a)), which is applicable only in the absence of a reorganization - Isabella M. Sheldon, supra; Commissioner v. Estate of Bedford, 325 U.S. 283, particularly if the result were to impose upon a taxpayer a greater tax liability than that encompassed by section 112(c)(2). Respondent insists that if 115(g) or 115(a) is not applicable, this is a 115(c) case. 115(g) and 115(a) cannot be applicable for the reasons already noted. Petitioners concede that they are taxable under section 115(c) as for a distribution in partial liquidation. And, indeed, assuming the relevance of section 115, the defining language of 115(i) appears to make express reference to this situation. It would be hard to escape the characterization *216 of these distributions as "amounts distributed in partial liquidation," considering that this phrase "means * * * one of a series of distributions in complete cancellation * * * of * * * a portion of its stock," in this case the first preferred. But no stock was turned in for this particular distribution, and the difficulty comes when we attempt to apply section 111 and to set off against the amount received any basis for the "property" given "in exchange," for the purpose of determining the gain. When the transaction was completed petitioners had retained as many shares of preferred stock as they had had before. It seems to follow that what they received at that time was all gain and that there is nothing as to which we can compute or offset any basis whatsoever. See Helvering v. Gowran, 302 U.S. 238. The result may be that petitioners' tax liability with respect to the January distribution will actually be no different from what it would have been had the provisions of section 115(a) been applied, as respondent urges. But this derives from the actual conduct of the operation to which we must resort, rather than to some unperformed purpose. We, accordingly, allocate no *217 part of the basis represented by the first preferred stock to the transaction resulting in the January distribution. Coming now to the distribution of December 31, 1941, a somewhat different approach is required. This was purportedly and actually a redemption of a portion of the preferred stock. By its terms it comes with precision under the definition of a partial liquidation in section 115(i) and is hence governed by the provisions of 115(c). See Yankey v. Commissioner (C.C.A., 10th Cir.), 151 Fed. (2d) 650. And that the corporation was not in process of reducing its operations is no longer of any consequence. Yankey v. Commissioner, supra; Benjamin R. Britt, 40 B.T.A. 790, affirmed (C.C.A., 4th Cir.), 114 Fed. (2d) 10. None of the criteria formulated for judging the similarity of such an operation to a distribution of corporate earnings appears to include the circumstances before us. See Darrell, Corporate Liquidations and The Federal Income Tax (1941), 89 U. Pa. L. Rev. 907, 913-914. The distributions were not pro rata among the shareholders and in fact their function was the contrary. There was a discoverable *218 and adequate business consequence both of the issuance of the stock and of its redemption to which there would have been no essential equivalence in the mere distribution of a dividend. Although the distributions were dependent upon the existence of earnings and profits, they would not reduce them except upon the assumption that the distributions were taxable dividends. Cf. Alice H. Bazley, 4 T.C. 897, affirmed (C.C.A., 3rd Cir.), 155 Fed. (2d) 237. The result is that while both sets of distributions should be treated as in partial liquidation under 115(c), only the December payment can be offset by the basis of the preferred stock surrendered for cancellation. The remaining dispute deals with the amount of the basis, and the central issue is the fair market value on March 1, 1913, of the property represented by the two merging companies.[5] Two methods are generally approved for the valuation of newspapers. The one is an appraisal of the circulation structure and of the physical assets, Daily Pantagraph, Inc., 9 B.T.A. 1173; the other the capitalization of tangibles and intangibles pursuant to the principles of A.R.M. 34, 2 C.B. 31. *219 See Toledo Newspaper Company, 2 T.C. 794. We have found the March 1, 1913, value of the News by valuing the circulation structure at approximately $10 a subscriber and adding the book value of the newspaper's tangible assets. The value fixed for the Record is that determined by respondent who has employed the formula described in A.R.M. 34 [2 CB 31]. Since, however, the circulation method would arrive at a smaller value, we have adopted respondent's figure. The interest given by petitioner John Hourigan to his children, petitioners John A. Hourigan, Jr., and Carolyn Hourigan, is the same as that of the donor, [6] it having been acquired by gift subsequent to 1920. Although the business was converted from a partnership into a corporation in 1939, it appears to be assumed by both parties that this was a tax-free exchange, and that the basis in the hands of petitioners was not affected. And apparently the basis of the real property transferred by petitioners John and Caroline Hourigan is not in controversy. *220 We do not understand that any additional question is presented by the sales of stock in 1941, once petitioners' basis therefor has been established. Decision will be entered under Rule 50. Footnotes
1. "If a distribution made in pursuance of a plan of reorganization is within the provisions of paragraph (1) of this subsection but has the effect of the distribution of a taxable dividend, then there shall be taxed as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be taxed as a gain from the exchange of property."↩
2. Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 185↩. 3. Anheuser-Busch, Incorporated, 40 B.T.A. 1100, affirmed (C.C.A., 8th Cir.), 115 Fed. (2d) 662, certiorari denied, 312 U.S. 699↩. 4. Minnesota Tea Co. v. Helvering, 302 U.S. 609↩.
5. Internal Revenue Code, section 113(a)(14)↩.
6. Internal Revenue Code, section 112(a)(2)↩.